**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Monje and Beth Monje, husband and wife, individually and on behalf of their minor son; and RM, minor son,<br><br>Plaintiffs,<br><br>v.<br><br>Spin Master Inc., a Delaware corporation; Spin Master Limited, a Canadian company; Toys "R" US-Delaware Inc.; and Moose Enterprises Proprietary Limited, an Australian company,<br><br>Defendants.<br><br>Spin Master, Inc., a Delaware corporation; Spin Master, LTD., a Canadian company,<br><br>Third-Party Plaintiffs,<br><br>v.<br><br>Bureau Veritas S.A.; Bureau Veritas Consumer Products Services, Inc.; Eurofins Scientific SE, and Product Safety Labs, Inc.,<br><br>Third-Party Defendants. | No. CV-09-1713-PHX-GMS<br><br>**ORDER** |

Defendant Moose Enterprises Propriety Limited has filed a Motion to Dismiss (Doc. 85) the Amended Complaint (Doc. 1-1) for lack of personal jurisdiction under Rule

12(b)(2). After reviewing the Parties' submissions, the Court denies the Motion.[1]

## BACKGROUND[2]

Moose is an Australian company that is registered in Melbourne. (Doc. 1-1 (Am. Compl.) ¶ 7; Doc. 85-1, Ex. A ¶ 4.) It does not have any offices in the United States, nor does it directly conduct retail or wholesale operations here. (Doc. 85-1, Ex. A ¶¶ 5–7.) Moose specializes in the design, development, manufacture, marketing, and distribution of a variety of children's toys throughout the world. (Doc. 1-1 (Am. Compl.) ¶ 7.) In order to facilitate expansion of its products into North America, Moose contracts with Defendant Spin Master to handle the distribution of Moose toys. (*Id.*)

One of those products is "Bindeez", which Spin Master marketed and sold in the United States as "Aqua Dots." (*Id.*) Aqua Dots are small, colorful beads that children could use to make various crafts. (*Id.* ¶ 16.) The idea was for children to arrange the beads into various designs on a tray. (*Id.*) The child would then spray her creation with water, which fused the beads together and enabled the child to remove her creation from the tray for display or play. (*Id.*)

Moose acquired the design for Aqua Dots from an independent toy inventor. (Doc. 85-1, Ex. A ¶ 13.) Moose contracted with a Chinese firm, JSSY, Ltd., to manufacture Aqua Dots. (Doc. 1-1 (Am. Compl.) ¶ 17; Doc. 85-1, Ex. A ¶ 13.) Moose then contracted with Spin Master for Aqua Dot distribution in the United States. (Doc. 1-1 (Am. Compl.) ¶¶ 18–19; Doc. 85-1, Ex. A ¶¶ 12–15.) Aqua Dots arrived on the shelves of United States retailers on April 1, 2007. (Doc. 1-1 (Am. Compl.) ¶ 20.) Moose, through Spin Master,

---

[1] The Monjes' motion for oral argument (Doc. 125) is denied because the Parties have had an adequate opportunity to discuss the law and evidence and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

[2] These facts are taken from the Monjes' Complaint and from the affidavits and exhibits attached to the pleadings filed in connection with Moose's Motion to Dismiss. The Court has accepted allegations in the Monjes' Complaint as true to the extent they are uncontroverted by Moose's affidavit and exhibits. Where conflicts exist between the facts contained in the parties' affidavits, depositions, and other discovery materials, those conflicts have been resolved in the Monjes' favor. *See Rio Props. Inc. v. Rio Int'l. Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002).

distributed around 4.2 million packages of Aqua Dots in the United States. (Doc. 106-1, Ex. 15.)

At some point in 2007, Plaintiffs Mark and Beth Monje purchased Aqua Dots from a Toys "R" Us store in Maricopa County, Arizona. (Doc. 1-1 (Am. Compl.) ¶ 11.) In July of 2007, Plaintiff Ryan Monje, the Monjes' 18-month-old son, ate some Aqua Dots. (*Id.* ¶¶ 2, 11.) Unbeknownst to the Monjes, Aqua Dots contained 1,4-butanediol, a harmful toxin that, when metabolized, converts into GHB, also known as the "date rape" drug. (*Id.* ¶ 22.) Ryan experienced "significant seizures, continued vomiting, went into respiratory failure, required intubation, and slipped into a coma." (*Id.* ¶ 13.) He was air-evacuated to Phoenix Children's Hospital. (*Id.*) Ryan suffered severe and permanent injuries to his brain and central nervous system. (*Id.* ¶ 15.)

Nurses found Aqua Dots in Ryan's vomit. (*Id.* ¶ 13.) The Monjes allege that Moose pressured JSSY to keep costs down and that pressure led to the substitution of the cheaper 1,4-butanediol for the more expensive nontoxic compound. (*Id.* ¶ 22.) On November 7, 2007, the United States Consumer Product Safety Commission ordered the recall of all Aqua Dots after several reports of injuries similar to those suffered by Ryan surfaced in the media. (*Id.* ¶ 21.) The Monjes bring a variety of product liability claims against Moose, Spin Master, and Toys "R" Us. Moose has moved to dismiss the Amended Complaint for a lack of personal jurisdiction.

**DISCUSSION**

**I.   LEGAL STANDARD**

The plaintiff bears the burden of establishing personal jurisdiction. *See, e.g., Ziegler v. Indian River Cnty.*, 64 F.3d 470, 473 (9th Cir. 1995). Once a defendant has moved to dismiss, "the plaintiff is obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction" over the defendant. *Cummings v. W. Trial Lawyers Assoc.*, 133 F. Supp. 2d 1144, 1151 (D. Ariz. 2001) (internal quotations omitted). "[M]ere allegations of a complaint, when contradicted by affidavits, are not enough to confer personal jurisdiction over a non-resident defendant." *Chem Lab Prods.,*

*Inc. v. Stepanek*, 554 F.2d 371, 372 (9th Cir. 1977); *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 (9th Cir. 1977) ("[W]e may not assume the truth of allegations in a pleading which are contradicted by affidavit.") A court may look to affidavits submitted by the parties in its determination. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). However, "conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiffs'] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists." *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).

Because no statutory method for resolving the personal jurisdiction issue exists, the district court determines the method of its resolution. *See Data Disc, Inc. v. Sys. Tech. Assocs.,* 557 F.2d 1280, 1285 (9th Cir. 1977) (citing *Gibbs v. Buck*, 307 U.S. 66, 71–72 (1939)). A district court may, but is not required to, allow discovery to help determine whether it has personal jurisdiction over a defendant. *See id.* at 1285 n.1. In addition, a district court may, but is not required to, hear evidence at a preliminary hearing to determine its jurisdiction. *See id.* at 1285 n.2. If the district court does not hear testimony or make findings of fact and permits the parties to submit only written materials, then the plaintiff must only make a prima facie showing of jurisdictional facts to defeat the defendant's motion to dismiss. *See Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 268 (9th Cir. 1995). Under this prima facie burden of proof, the plaintiff need only establish facts, through admissible evidence, that if true would support personal jurisdiction over the defendant. *See Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). The Court has determined to proceed on the written materials submitted by the Parties. Accordingly, the Monjes' request for discovery is denied.

## II.  ANALYSIS

### A.  The Test

To establish that personal jurisdiction over Moose is proper, the Monjes must demonstrate that (1) Arizona's long arm statute confers jurisdiction over Moose, and (2) that "the exercise of jurisdiction comports with the constitutional principles of Due

Process." *See Rio Props. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002) (citation omitted); Fed. R. Civ. P. 4(k)(1)(A). Because Arizona's long-arm statute extends jurisdiction "to the maximum extent permitted by the . . . Constitution of the United States," the personal jurisdiction inquiry collapses into a Due Process analysis. *See* Ariz. R. Civ. P. 4.2(a); *Davis v. Metro Prod., Inc.*, 885 F.2d 515, 520 (9th Cir. 1989); *Williams v. Lakeview Co.*, 199 Ariz. 1, 5, 13 P.3d 280, 282 (2000). Absent traditional bases for personal jurisdiction (e.g., physical presence, domicile, and consent) the Due Process Clause requires that nonresident defendants have certain "minimum contacts" with the forum state such that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

"In determining whether a defendant had minimum contacts with the forum state such that the exercise of jurisdiction over the defendant would not offend the Due Process Clause, courts focus on 'the relationship among the defendant, the forum, and the litigation.'" *Brink v. First Credit Resources*, 57 F. Supp. 2d 848, 860 (D. Ariz. 1999) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). If a defendant's contacts with the forum state are sufficient to satisfy the Due Process Clause, then the Court must exercise either "general" or "specific" jurisdiction over the defendant. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414–15 nn.8–9 (1984); *Ziegler*, 64 F.3d at 473. The nature of a defendant's contacts with the forum state will determine whether the Court exercises general or specific jurisdiction over him. *Helicopteros Nacionales*, 466 U.S. at 414-15 nn.8-9. Because no party contends that the Court has general jurisdiction over Moose, only the exercise of specific jurisdiction will be considered.

*Schwarzenegger* governs determinations of whether sufficient minimum contacts exist to enable a given forum to exercise specific jurisdiction. Specific jurisdiction exists only if (1) the defendant *purposefully availed* himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws, or *purposely directs* conduct at the forum that has *effects* in the forum; (2) the claim *arises*

*out of* the defendant's forum-related activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice, i.e., it is *reasonable. See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801–02 (9th Cir. 2004). Since the Monjes assert that the Court has jurisdiction over Moose, they have the burden of establishing the first two elements; if they are successful, Moose must come forward with a "compelling case that the exercise of jurisdiction would not be reasonable." *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012) (internal quotation marks and citations omitted).

### B. Purposeful Direction

Specific jurisdiction over a tort defendant like Moose exists where the intended effects of the defendant's non-forum conduct were purposely directed at and caused harm in the forum state. *Calder v. Jones*, 465 U.S. 783, 788–90 (1984); *see Sinatra v. Nat'l Enquirer*, 854 F.2d 1191, 1195 (9th Cir. 1988); *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 n.1 (9th Cir. 1995) (applying effects test to defamation, tortious interference with business relations, and intentional infliction of emotional distress claims). Thus with respect to tort claims, the effects test requires that the defendant have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).

#### 1. Intentional Act

No party contests this element. "We construe 'intent' in the context of the 'intentional act' test as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Schwarzenegger*, 374 F.3d at 806. Moose intended to design and facilitate the manufacture and distribution of Aqua Dots. Therefore, the first *Calder* element is satisfied.

#### 2. Express Aiming

"Purposeful direction" and "express aiming" are highly abstract phrases that "in

the jurisdictional context hardly define[ ]" themselves. *Bancroft*, 223 F.3d at 1087. In cases where a foreign defendant has designed or manufactured a product that is then sold by another in the domestic market, courts have employed a "stream of commerce" metaphor to determine whether exercise of jurisdiction is proper. *Asahi Metal Indus. Co. v. Sup. Ct. of Cal.*, 480 U.S. 102 (1987). *Asahi* contained two plurality opinions that debated whether placing a defective product in the stream of commerce was sufficient to satisfy the Due Process clause or whether "something more" was required. *See id.* at 112 (plurality op. of O'Connor, J.) (requiring "something more"); *id.* at 116-121 (Brennan, J., concurring) (looking to whether the foreign entity foresaw that its products would end up in the forum).

The Ninth Circuit has followed Justice O'Connor's plurality opinion in *Asahi* by holding that "[t]he placement of a product into the stream of commerce, without more, is not an act purposefully directed toward a forum state. . . . Even a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream of commerce into an act purposefully directed toward the forum state." *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007).

The parties however, both contend that a subsequent case decided by the Supreme Court in 2011, *J. McIntyre Machinery, Ltd. v. Nicastro*, ___ U.S. ___, 131 S. Ct. 2780 (2011), controls the result here. An examination of the decision and its implications is therefore in order.

### a. The *J. McIntyre* Decision and Its Impact

There is significant factual similarity between this case and the one before the Supreme Court in *J. McIntyre*. A worker suffered serious hand injuries while laboring in New Jersey on a metal-shearing machine manufactured by a U.K.-based company. *Id.* at 2786. The U.K. manufacturer sold its machines in the United States through an independent distributor. *Id.* The manufacturer attended annual conventions in the United States (though not in New Jersey), held patents on its recycling technology, but sold only

- 7 -

one machine in New Jersey. *Id.* The Supreme Court, 6-3, held that such facts were insufficient to support an exercise of personal jurisdiction by a New Jersey state court over the U.K. manufacturer; however, no majority rationale emerged. Nevertheless, six Justices rejected the New Jersey Supreme Court's holding that "a producer is subject to jurisdiction for a products-liability action so long as it 'knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states.'" *Id.* at 2793 (Breyer, J., concurring) (quoting *Nicastro v. McIntyre Machinery Am., Ltd.*, 987 A.2d 575, 591–92 (N.J. 2010)).

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted). The Court first examines the plurality opinion and then the controlling concurrence.

The four Justices in the plurality, led by Justice Kennedy, sought to return the discussion from stream of commerce theory to purposeful availment: "The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *J. McIntyre*, 131 S. Ct. at 2788. He stated that Justice O'Connor's stream of commerce "plus" was merely a specific manifestation of purposeful availment. *Id.* (this idea "does not amend the general rule of personal jurisdiction. It merely observes that a defendant may in an appropriate case be subject to jurisdiction without entering the forum—itself an unexceptional proposition—as where manufacturers or distributors 'seek to serve' a given State's market"). The plurality did not find sufficient facts to determine that the U.K. manufacturer sought to serve the New Jersey market.

This idea of targeting the specific New Jersey market, however, occupied much of

the plurality's discussion. Justice Kennedy emphasized the unique federal system present in the United States, and acknowledged that there could be a separate inquiry into the extent of a foreign entity's contacts with an individual state and those with the United States as a whole. *See id.* ("These facts may reveal an intent to serve the U.S. market, but they do not show that J. McIntyre purposefully availed itself of the New Jersey market."); *id.* at 2789 ("Because the United States is a distinct sovereign, a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State. This is consistent with the premises and unique genius of our Constitution."). He thus emphasized that the U.K. manufacturer did not purposefully avail itself of New Jersey and its laws, or direct its conduct into New Jersey itself, which meant that New Jersey—a separate sovereign in the federal system—could not constitutionally exercise personal jurisdiction. *Id.* at 2790. The plurality declined to import the U.K. manufacturer's contacts with the United States as a whole into a specific state: "Here the question concerns the authority of a New Jersey state court to exercise jurisdiction, so it is petitioner's purposeful contacts with New Jersey, not with the United States, that alone are relevant." *Id.* Central to the plurality's decision, therefore, was that an exercise of jurisdiction by a state court was in play; the implications of that rationale for the exercise of jurisdiction in federal courts is unclear.

Justice Breyer, joined by Justice Alito, concurred in the judgment only. He declined to adjust the jurisdictional formulas previously deployed by the Supreme Court to deal with these cases. He instead focused on the extent of the U.K. manufacturer's efforts in the United States. Justice Breyer emphasized that the U.K. manufacturer's distributor in the United States "on *one* occasion sold and shipped *one* machine to a New Jersey customer, namely," the machine at issue in the case. *Id.* at 2792 (emphasis added). He then wrote that prior Supreme Court decisions "strongly suggest[ ] that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place." *Id.* (citing the three

opinions in *Asahi*). He concluded that "the relevant facts found by the New Jersey Supreme Court show no 'regular . . . flow' or 'regular course' of sales in New Jersey; and there is no 'something more,' such as special state-related design, advertising, advice, marketing, or anything else." *Id.* (internal citation omitted). In other words, Justice Breyer endorsed Justice O'Connor's formulation of the stream of commerce theory in *Asahi*. He was looking for something more and could not find it in the record in *J. McIntyre*.

And his opinion is the governing opinion under *Marks*—the narrowest grounds for concurrence were the absence of "something more" than merely placing a product in the stream of commerce. The Ninth Circuit has not yet applied *J. McIntyre* in a stream of commerce setting. Other Courts of Appeals, however, have interpreted *J. McIntyre* in a similar manner. *See AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1363 (Fed. Cir. 2012) ("Thus, the crux of Justice Breyer's concurrence was that the Supreme Court's framework applying the stream-of-commerce theory—including the conflicting articulations of that theory in Asahi—had not changed, and that the defendant's activities in McIntyre failed to establish personal jurisdiction under . . . that theory."); *ESAB Group, Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 392 (4th Cir. 2012) ("Thus, the Supreme Court has rejected the exercise of jurisdiction where a defendant has merely placed a product into the stream of commerce foreseeing that it might ultimately reach the forum state. . . . But where a defendant has 'targeted the forum' with its goods, sufficient contacts exist.").

A few principles can be extracted from *J. McIntyre* that guide the disposition of the present motion. First, Justice Breyer's concurring opinion preserved the status quo in the Ninth Circuit. A foreign entity that places its product into the stream of commerce and then passively observes its distribution—hoping, even expecting that the product might be distributed in the domestic market—has not done enough to enable a court to exercise personal jurisdiction. On the other hand, a foreign entity that not only places a product into the stream of commerce, but initiates a "regular flow" and then coaxes the

course of the product flow to its intended destination, has likely done the "something more" that allows a court to exercise jurisdiction. Thus, the extensiveness of the foreign entity's involvement in the downstream process is a key indicator.

Second, quantity matters. Justice Breyer repeatedly mentioned that "a single sale" in the state was insufficient basis to establish personal jurisdiction. *J. McIntyre*, 131 S. Ct. at 1792. Jurisdiction cannot hinge on a foreign entity who, through its local distributor "on *one* occasion sold and shipped *one* machine to a New Jersey customer." *Id.* The limited nature of the U.K. distributor's operation had a significant impact on the outcome of the case. Drips or trickles will not suffice. Courts should look for a "regular . . . flow" or "regular course" of sales. *Id.*

Third, and finally, the plurality opinion's emphasis on federalism left open the question of how to address a federal court's jurisdiction where the defendant has sufficient contacts with the United States as a whole, but not necessarily with a particular state. Indeed, a literal application of this approach yields peculiar outcomes.[3]

### b. Moose's Express Aiming

As the record currently stands,[4] Moose did not passively launch its product into the stream of commerce. It was involved in every aspect of the Aqua Dots—from design, to manufacture, to distribution—to a degree sufficient to convince this Court that it may exercise jurisdiction over Moose.[5] At the manufacturing stage, Moose was in fairly

---

[3] To emphasize "conduct directed at the society or economy existing within the jurisdiction of a given sovereign" does not prevent the conclusion that a defendant's conduct is "directed at" the forum state when the defendant's conduct is directed at a territorial entity (such as the entire United States) that includes the forum state. Indeed, a host of strange results would ensue if courts were to conclude that a defendant does not seek to serve the forum state when it seeks to serve a territorial area that includes the forum state.

Adam N. Steinman, *The Lay of the Land: Examining the Three Opinions in* J. McIntyre Machinery, Ltd. v. Nicastro, 63 S. Car. L. Rev. 481, 493 (2011).

[4] If evidence comes to light that casts severe doubt on the Court's conclusions, Moose may reassert its personal jurisdiction defense.

[5] The Monjes cites several portions of the attached record that either do not substantiate the claims made in their Response or do not exist. Obviously, the Court has

- 11 -

constant contact with JSSY, its Chinese manufacturer, regarding the design and manufacturing specifications for the Aqua Dots. (Doc. 106-1, Ex. 4 at "Doc. 9"; *id.*, Ex. 5 (Skliros Dep.) at 39:5–40:23.) Email records appear to show that Moose was intimately involved in the choice of the material used to make the Aqua Dots (*id.*, Ex. 4 at "Doc. 9"; 91; *id.* at 89:18–92:4), and it was that choice of material that is at the crux of the Monjes' claims. Furthermore, Moose employees designed the shape, size, and color of the Aqua Dots. (*Id.*, Ex. 2 (Stul Dep.) at 55:5–59:24.) Moose assigned employees to oversee the manufacturing process and ran quality control over the manufacture out of its Hong Kong office. (*Id.*, Ex. 4 (Polous Dep.) at 63:23–65:16.) In other words, Moose was moving the Aqua Dots downstream toward the United States. Contrary to its assertions, it did not merely send the design to JSSY; Moose was significantly involved in the manufacturing process.

Further, Moose wanted the Aqua Dots to be marketed and sold in the United States. Moose facilitated the move of Aqua Dots from JSSY, the manufacturer, to Spin Master, the distributor. (*Id.*, Ex. 7 (Kennedy Dep.) at 46:18–47:4.) Moose had an employee who oversaw the distribution of Aqua Dots and maintained contact with Spin Master. (*Id.*, Ex. 4 (Polous Dep.) at 64:10–16.) Moose filed two patent applications with the U.S. Patent and Trademark Office related to Aqua Dots, and assisted Spin Master in performing the necessary testing in the U.S. and Canada to ensure the approval of Aqua Dots. (*Id.*, Exs. 10, 11.) Moose supplied Spin Master with a wealth of marketing material to use in the United States, including packaging artwork, marketing plans, television drafts, and posters. (*Id.*, Ex. 4 (Polous Dep.) at 135:11–136:24.)

It does not appear Moose relinquished full control of distribution to Spin Master. When the incidents of children swallowing Aqua Dots increased, there was regular contact between Spin Master and Moose. (*Id.*, Ex. 9.) Moose's control over the distribution process was apparent when it ordered a suspension of all shipments of Aqua Dots following an incident with a child in New Zealand. (*Id.*, Ex. 2 at "Doc. 27".)

---

not considered such assertions.

Throughout this time, Moose was actively involved in responding to retailers' concerns. (*Id.*, Ex. 2 at "Doc. 17", "Doc 15".)

Moose also reached out to potential customers in the United States and invited them to try its products. On its website, Moose informed interested customers that, "[w]hether you are from Australia or the USA[,] Moose products can be found far and wide." (Doc. 106-1, Ex. 13.) The website then invites those "Stateside" to "find [their] closest store" by contacting their customer service team, who could presumably direct the customers to nearby retail outlets contained Moose products. (*Id.*) Moose also claims that it has established a showroom in New York. (*Id.*, Ex. 14.)

The extent of Moose's involvement in the distribution process exceeded that of the U.K. manufacturer in *J. McIntyre*. Moose was involved in the response to customer complaints about Aqua Dots' safety, and adjusted the flow of Aqua Dots into the United States accordingly. Millions of Aqua Dots were sold throughout the United States (Doc. 106-1, Ex. 15), which likely generated substantial revenues for Moose. The fact that 4.2 million sets of Aqua Dots were sold within the United States must say something about the extent to which it, as a whole, was an intended market for Moose. Further, the sale of 4.2 million sets of Aqua Dots contrasts rather sharply with the sale of the metal-shearing machines in *J. McIntyre.* One might imagine a comparatively low-volume of sales of metal-shearing machines throughout the United States which could conceivable mean that there was no particular reason for the manufacturer to believe than any would be sold in New Jersey. Justice Breyer emphasized the fact that there was only one such sale. In this case, however, millions of sets were sold throughout the country. With such a difference in facts, it is difficult to suppose that Moose, in purposefully directing its product at America, did not also purposefully direct at each one of the states which comprise it. In this sense, this case differs from *J. McIntyre* in both volume and the level of involvement.

These facts, if true, show that Moose was not just aware that Aqua Dots might end up in the United States, and therefore in Arizona—it expressly directed the stream of

commerce to the United States' doorstep. The website is a prime example of this—Moose solicited United States citizens to buy its products and gave them instructions how to accomplish this.

Moose's chief argument is that its direction of its product into the United States does not mean that a federal court in Arizona can properly exercise jurisdiction. In doing so, it relies on the rationale set forth in the *J. McIntyre* plurality opinion that "an intent to serve the U.S. market . . . [did] not show that J. McIntyre purposefully availed itself of the New Jersey market." 131 S. Ct. at 2790. The Court rejects this argument for a number of reasons. The plurality opinion did not control a majority of the Court in this respect.[6] Second, Justice Kennedy was addressing a factual situation in which a state court was attempting to exercise jurisdiction, not a federal court.[7] Third, a direct application of that principle to this case would produce a strange outcome. As this Court has noted elsewhere, this approach "has the potential to lead to absurd practical results. . . . [A] defendant could direct a distributor to manufacture and market defective products to the United States market in general, yet avoid jurisdiction in any United States forum." *Patterson v. Home Depot, USA, Inc.*, 684 F. Supp. 2d 1170, 1184 (D. Ariz. 2010). This Court's conclusion in *Patterson* holds true here, and is undisturbed by the fractured decision in *J. McIntyre*: "[A] manufacturer or designer can be found to have directed a product at a specific forum when he or she intends, and takes affirmative steps [the "something more"], to deliver a defective product to the United States as a whole with reason to know that the product will be marketed in the forum state." *Id.* at 1185; *see also*

---

[6] Justice Breyer (joined by Justice Alito) did not endorse it in his concurrence. *See J. McIntyre*, 131 S. Ct. at 2793. Justice Ginsburg (joined by Justices Sotomayor and Kagan) expressly rejected it in her dissent. *See id.* at 2798.

[7] It is true that Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure points federal courts to the relevant state long-arm statute, and this seems appropriate as it is difficult to see how any products liability case would not be applying state law. Yet the plurality opinion draws such a sharp distinction between state and federal sovereignty in a case in which a products liability case was brought in state court that it appears that the plurality would thus make differentiations between a state court's application of strict product liability laws and a federal court's application of those same laws as far as it pertained to the exercise of jurisdiction over a foreign defendant. .

- 14 -

*Plant Food Co-op v. Wolfkill Feed & Fertilizer Corp.*, 633 F.2d 155, 159 (9th Cir. 1980) ("If the sale of a product of a distributor is not an isolated occurrence, but arises from the efforts of the distributor to serve, directly or indirectly, the market for its products in other states, it is not unreasonable to subject it to suit in one of those states if its allegedly defective merchandise has there been the source of injury to its owner or others.").

Moose was sufficiently involved in the distribution process for the Court to conclude that it took affirmative steps and expressly aimed its products into the fifty states. Arizona is one of those states and apparently received numerous shipments of Aqua Dots. Moose does not point to any evidence that Aqua Dots were sold only in certain parts of the United States, but not others. Moose cannot plan to have its product shipped into all of the United States, work closely with another entity to execute that plan, and then object when a federal court located in one of those states attempts to exercise personal jurisdiction over it.

### 3. Foreseeability

Neither party contests that it would have been foreseeable for any harm caused by Moose's product to be suffered in the United States. The Court's reasoning and conclusions regarding Moose's acts of express aiming likewise dictate its conclusion that Moose knew any harm caused by its products was likely to be suffered throughout the United States, including in Arizona.

The Monjes have therefore established that Moose purposefully directed its activities to Arizona.

## C. Arising Out Of

No one contests that the Monjes' case "arises out of" Moose's contacts with Arizona. The design, manufacture, and sale of Aqua Dots are what the Monjes allege led to their son's serious and permanent brain damage. Therefore, this element has been established.

## D. Reasonableness

Coming back to the *Schwarzenegger* test, the Court has found that the Monjes

have carried their burden to establish the first two prongs. The burden now shifts to Moose to present a "compelling case that the exercise of jurisdiction would not be reasonable." *Washington Shoe*, 704 F.3d at 672. Seven factors serve as touchstones of this inquiry:

> (1) [T]he extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007).

First, Moose's purposeful interjection into Arizona is admittedly layered. Moose itself has no offices, licenses, or direct contact with Arizona (or any of the United States for that matter). (Doc. 85, Ex. A ¶¶ 5–11.) The Aqua Dots that Arizona consumers like the Monjes purchased from retailers came first from Spin Master, who got them from JSSY, who got them from Moose. Nevertheless, Moose facilitated all of the transactions that led to the purchase of Aqua Dots in Arizona. It worked with both entities to ensure the success of Aqua Dots in the United States. Moose did so in order to reap the economic gains that come from selling a new product in a developed market. Therefore, this factor leans in favor of jurisdiction.

Second, the burden on Moose to defend this lawsuit will be heavy. The distance between Australia and Arizona is substantial, even with "the advent of modern transportation", *Ballard v. Savage*, 65 F.3d 1495, 1501 (9th Cir. 1995) (internal quotation marks omitted). As Moose asserts, coordination of discovery is likely to be problematic. Nevertheless, the Ninth Circuit does not allow this factor to defeat jurisdiction unless the "inconvenience is so great as to constitute a deprivation of due process. . . ." *Roth v. Garcia Marquez,* 942 F.2d 617, 623 (9th Cir. 1991). Moose has not presented any evidence that this would be so. Discovery issues can be handled in a manner that works the least disruption and inconvenience. Still, this factor weighs against exercising

jurisdiction over this case.

Moose does not advance any arguments under the remaining factors. Most of the remaining factors favor the Monjes. The Court recognizes that reaching into Australia to exercise jurisdiction will place a substantial burden on Moose. Nevertheless, Moose reached first into the United States, including Arizona, to establish a market for its products. Therefore, the Court concludes that it can exercise personal jurisdiction over Moose.

## CONCLUSION

On the limited record before it, the Court concludes that the Monjes have shown that Moose had sufficient minimum contacts with Arizona to enable the Court to exercise personal jurisdiction over it. While practical problems will arise, those problems are not sufficient to make exercise of jurisdiction unreasonable.

**IT IS THEREFORE ORDERED** that Moose's Motion to Dismiss (Doc. 85) is **DENIED.**

**IT IS FURTHER ORDERED** that the Monjes' Motion for Oral Argument (Doc. 125) is **DENIED.**

Dated this 29th day of May, 2013.

*A. Murray Snow*
G. Murray Snow
United States District Judge